IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

BRADFORD HUFF,                           *

    Plaintiff,                       *

vs.                                      *          CASE NO. 3:20-CV-57 (CDL)

WALTON COUNTY, GEORGIA, *et al.*,        *

    Defendants.                      *

_____

O R D E R

The material facts in this case are not complicated.  Bradford Huff worked for Walton County's Parks and Recreation Department. He and his supervisor, Jody Johnson, had a side business running for-profit baseball tournaments using county facilities.  After receiving complaints about the tournaments, the Walton County Board of Commissioners voted to prohibit county employees from organizing tournaments on county property for private profit. Then, Huff and Johnson's attorney sent the Board of Commissioners a letter demanding $500,000; Huff and Johnson filed a defamation action against a sitting commissioner and a county employee; and Huff sent two emails to the Georgia Peace Officer Standards and Training Council ("POST")—the first to complain about how the Walton County Sheriff had handled an investigation of the tournaments and the second to report what Huff had heard from someone else about the sheriff's alleged involvement in a suspected

dirt stealing incident.  After Huff and Johnson's defamation action was dismissed, the Board of Commissioners voted to terminate Huff and temporarily suspend Johnson.

Huff brought this action against Walton County and the members of the Board of Commissioners who voted to fire him.  He makes two claims under 42 U.S.C. § 1983.  First, he asserts that Walton County violated the First Amendment when it terminated him for the demand letter, the defamation lawsuit, and the POST emails.  Second, Huff contends that Walton County deprived him of a property interest in his continued employment.  He also asserts state law claims for breach of contract and violations of Georgia's Whistleblower Protection Act.  Defendants filed a motion for summary judgment as to all claims.  As discussed below, that motion (ECF No. 44) is granted in part and denied in part.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the

outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

Although the Court's previous summary of the essential facts adequately explains the nature of the claims asserted in this action, the following more detailed description of what happened, with all reasonable inferences construed in Huff's favor, provides the background for deciding the pending summary judgment motion.[1]

Bradford Huff was employed by Walton County as the athletics division manager in the Parks and Recreation Department.  His immediate supervisor was Jody Johnson, the director of the Parks and Recreation Department.  Before 2016, Huff and Johnson had

---

[1] Huff submitted a lengthy response to Defendants' statement of material facts.  The Court reviewed and considered that response, along with Huff's revised response brief, which contains a statement of facts with citations to the record—although many of Huff's factual assertions are not actually supported by the record citations.  Huff also submitted a 79-page, 226-paragraph statement of additional "material facts."  That statement of additional "material facts" is shorter than the original 209-page, 663-paragraph document, which the Court struck because it was "lengthy and unfocused," was "full of legal conclusions," repeated many facts that were already addressed in the response to the statement of material facts, and was full of immaterial facts.  Order Granting Mot. to Strike 2 (Apr. 7, 2022), ECF No. 70.  The Court gave Huff an opportunity to cure the defects in his statement of material facts, and Defendants object to the revised statement because it does not comply with Local Rule 56.  The Court reviewed the revised statement.  Like its predecessor, the revised statement is lengthy, unfocused, and full of argument and legal conclusions.  It is repetitive and duplicative of Huff's response to Defendants' statement of material facts, and it is full of immaterial facts.  For these reasons, the revised statement does not comply with Local Rule 56's requirement that the additional fact statement be *concise* and address *material* facts to which a *genuine* dispute exists.  The Court thus declines to consider it.

direct control and supervision of Walton County's ball fields and athletic facilities. Bradford Decl. ¶ 2, ECF No. 44-1. Huff and Johnson also had a business called JB Athletics, LLC. For about ten years, JB Athletics rented Walton County baseball fields to host private, for-profit baseball tournaments. Huff Decl. ¶ 64, ECF No. 61-8; Johnson Dep. 12:1-16, ECF No. 48. JB Athletics got permission from the county attorney before starting to run tournaments on Walton County ball fields. Huff Decl. ¶ 64. When the tournaments started in 2007, they were very small, with eight teams or fewer in each tournament. Huff Dep. 52:9-13, ECF No. 49. By 2016, JB Athletics hosted around eight tournaments per year in Walton County, with roughly 100 teams per event. *Id.* at 52:13-15, 54:14-19. During a tournament, JB Athletics "fill[ed] up every park in Walton County." *Id.* at 52:14-15.

Huff acknowledges that some citizens complained about the use of Walton County facilities for JB Athletics tournaments. There was a divide within the county commissioners on the tournaments: while Board of Commissioners Chairman Kevin Little supported the tournaments, Commissioner Lee Bradford and other commissioners developed concerns about the use of county facilities for the private tournaments and about possible misuse of county equipment and employee time. Bradford Decl. ¶¶ 2-4; Adams Decl. ¶¶ 2-3, ECF No. 44-5; Banks Decl. ¶¶ 2-3, ECF No. 44-2; Dixon Decl. ¶¶ 2-3, ECF No. 44-4; Shelnutt Decl. ¶¶ 2-3, ECF No. 45. In 2016, the

Walton County Board of Commissioners asked the County's human resources department to investigate whether Huff and Johnson were using county equipment or county employee time in connection with the JB Athletics tournaments.  Ferguson Decl. ¶ 2, ECF No. 46.

Following the investigation, the Walton County Board of Commissioners voted in July 2016 not to allow any county employee to run or organize tournaments on county property for private profit.  Adams Decl. ¶ 4 (stating that the decision was "[a]s a result of the complaints and controversy"); Banks Decl. ¶ 5 (stating that the decision was "[a]s a result of continuing citizen complaints, controversy and [commissioners'] concerns over these employees running the private tournaments for their personal gain"); Dixon Decl. ¶ 5 (stating that the decision was "[a]s a result of citizen complaints, the public controversy and [commissioners'] concerns over employees running the private tournaments for personal gain"); *accord* Shelnutt Decl. ¶¶ 3-4 (stating that Shelnutt approved the measure because he "personally received numerous complaints from citizens about Brad Huff's attitude and treatment of citizens in regard to the use of the facilities").[2]  Based on this decision, Huff and Johnson were no

---

[2] Huff denies that the decision was related to any information collected during an investigation, but he did not point to *evidence* to dispute that the commissioners considered the complaints and other information like they said they did.  Rather, he points to Little's speculation that Huff and Johnson were "caught up in" Bradford's "political warfare" against Little and that the other commissioners merely followed "Bradford's political desires."  Little Decl. ¶¶ 86, 89, ECF No. 61-9.

longer permitted to rent Walton County facilities for JB Athletics tournaments.

Around the same time, the Board of Commissioners directed the county attorney to ask the Walton County sheriff and the Walton County district attorney to determine whether there was any criminal wrongdoing in connection with the JB Athletics baseball tournaments. A search warrant was obtained to seize and search the county computers assigned to Huff and Johnson from their county office. Huff asserts that the Sheriff "called in the search warrant" and that the magistrate admitted that he "does not always pay attention to every search warrants [sic] that the Sheriff calls in, that he just signs off on them." Little Decl. ¶ 38. Defendants did not specifically object to this evidence. The search warrant affidavits stated that allegations "ha[d] surfaced" that JB Athletics used county maintenance equipment "to maintain and prepare baseball fields for the purpose of monetary gain" and that Huff and Johnson allowed JB Athletics to rent county facilities "at amounts lower than normal." Defs.' Mot. for Summ. J. Ex. K, Search Warrant Affs., ECF No. 44-11. The affidavits did not disclose the source of these allegations, did not mention an informant, and did not establish that the officer had independent knowledge of the allegations. The district attorney ultimately concluded that there was no criminal wrongdoing and that criminal charges were unwarranted.

In January 2017, an attorney for Huff, Johnson, and JB Athletics sent a notice of claim/settlement demand letter to the Walton County Board of Commissioners. Defs.' Mot. for Summ. J. Ex. L, Letter from A. Tennille to K. Little (Jan. 31, 2017), ECF No. 44-12. The letter accused "a vocal few," led by Bradford, of engaging in a "smear campaign" of Huff and Johnson that resulted in Walton County "singl[ing] . . . out" Huff and Johnson to stop them from running tournaments. *Id.* The letter did not state the legal theories for any claims by Huff and Johnson, but it did assert that the county had caused "significant damages" to them and offered to settle all claims for $500,000. *Id.* No disciplinary action was taken against Huff or Johnson at that time.

Walton County did not pay the demand. Huff, Johnson, and JB Athletics filed an action against Bradford, a county employee named James Robertson, and three other individuals in the Superior Court of Walton County. Huff, Johnson, and JB Athletics alleged that Bradford and others "launched a smear campaign targeting" them, fabricating evidence as part of a scheme to stop Huff and Johnson from hosting baseball tournaments in Walton County. Defs.' Mot. for Summ. J. Ex. N, 1st Am. Compl. ¶¶ 2, 18 (Dec. 14, 2017), ECF No. 44-14. Plaintiffs claimed that Bradford used his authority as a county commissioner to pressure Johnson to hire Robertson to work for the Parks and Recreation Department, then Robertson falsely reported that Huff and Johnson used county equipment and

materials for their personal business and fabricated evidence to make it look like JB Athletics left a mess following tournaments—evidence that the other defendants used to get the county to change its policy on county employees' use of county facilities. *Id.* ¶¶ 18-27. Huff, Johnson, and JB Athletics asserted claims for defamation and tortious interference. As discussed below, the claims against Bradford and Robertson were later dismissed under Georgia's Anti-Strategic Lawsuit Against Public Participation ("Anti-SLAPP") statute.[3]

At some point, Bradford learned that Little had encouraged Huff and Johnson to pursue the superior court defamation action. Bradford and several other commissioners believed that the defamation action created conflict between the Parks and Recreation Department and the board of commissioners, though they did not point to any examples of conflicts caused by the defamation action. Adams Decl. ¶ 11; Banks Decl. ¶ 12; Bradford Decl. ¶¶ 11-12; Dixon Decl. ¶ 11. Defendants did not take action against Huff or Johnson based on the defamation action at that time.

While the superior court defamation action was pending, Huff sent two emails to a representative of the Georgia POST from his county computer using his official county email address. At the

---

[3] When he filed the defamation action, Huff did not understand that a Parks and Recreation employee in his position might be considered a "public figure" for purposes of a defamation claim. Huff Decl. ¶ 71.

time, POST was investigating Walton County Sheriff Joe Chapman because he had been arrested for battery in Florida.   Though the emails were both sent during the workday, Huff asserts that he was off duty at the specific times when he sent the emails from his county computer using his county email address.

In the first email, Huff stated that Walton County Sheriff Joe Chapman "ruined [Huff's] personal and professional reputation in an attempt to send Walton County Board of Commissioners Chairman Kevin Little to Federal Prison" and that Chapman placed Huff and Johnson "in the middle of his power hungry political games attempting to destroy the Chairman of Walton County."   Defs.' Mot. for Summ. J. Ex. P, Email from B. Huff to J. Lewandowski (Jan. 25, 2018, 1:58 PM), ECF No. 44-16.   Huff elaborated that Chapman falsely accused Huff and Johnson of paying kickbacks to Little, and he asserted that Chapman seized Huff and Johnson's county computers without probable cause and that the magistrate just signed off on it without paying attention.   *Id.* at 2.   Huff asked the POST representative to review all of Huff's evidence to "get a clear understanding of how Sheriff Joe Chapman attempted to destroy the life of Walton County Commission Chair Kevin Little and the personal/professional reputations of both [Huff] and Jody Johnson."   *Id.* at 3.

In the second email, Huff stated that he had "suffer[ed] at the hands of Sheriff Chapman's abusive political tactics."   Defs.'

Mot. for Summ. J. Ex. Q, Email from B. Huff to K. Vance (Feb. 28, 2018, 11:18 AM), ECF No. 44-17 ("2d POST Email").  As an example of Chapman's alleged intimidation tactics, Huff summarily referenced "Chapman's past drug planting tactics (the Ms. Jones Case)."  *Id.* at 1.  Huff did not provide any specifics of the Jones case in his email, and he did not state that he had any personal knowledge of the case.  Huff appears to refer to a 2015 incident where a deputy sheriff allegedly directed a confidential informant to plant drugs in Ms. Jones's car.  Chapman was not a defendant in that action and was not alleged to have planted any drugs.  *See generally* Compl. in *Jones v. Barrett*, ECF No. 1 in 3:17-CV-13 (M.D. Ga. Jan. 24, 2017).

     As another example of Chapman's "abusive ways," Huff described an incident that had been relayed to him by Little, who had heard it from someone else.  2d POST Email at 1.  According to this third-hand account, Chapman received a report of a private contractor hauling dirt from Walton County property in late 2017.  The contractor was Anderson Grading—Commissioner Timmy Shelnutt's employer.  Chapman called the county's public works director and stated that he knew who got the dirt and that he "would use it as leverage in the future as Walton County Commissioners voted on issues concerning the Walton County Sheriff Office."  *Id.* at 1-2.  As it turns out, the dirt was hauled to the home of Anderson Grading's owner, who happened to be Chapman's campaign manager,

with the permission of the public works director. *Id.* When Little informed Shelnutt about Chapman's statement, Shelnutt told Little that he would call the person who received the dirt and that "Chapman would keep his mouth shut in the future." *Id.* at 2. Huff characterized the incident as Chapman's attempt to "intimidate Commissioner Shellnutt [sic] to vote in his favor," but he also asserted that Chapman overlooked the "stealing of Walton County property . . . without any investigation." *Id.* at 2. Ken Vance from POST forwarded both emails to Chapman on March 1, 2018. Several Walton County commissioners received them shortly after that. No action was taken regarding the emails at that time.

In March of 2019, the Superior Court of Walton County granted a motion to strike all the claims against Bradford and Robertson in the defamation action under Georgia's Anti-SLAPP law. Defs.' Mot. for Summ. J. Ex. O, Order (Super. Ct. Walton Cnty. Mar. 7, 2019), ECF No. 44-15 ("Super. Ct. Order"). The Superior Court concluded that Huff and Johnson had not established a probability of prevailing on their defamation claim because the court found that they were public figures and had not alleged facts to suggest actual malice. The Superior Court entered judgment in favor of Bradford and Robertson as to all claims and ruled that Bradford and Robertson were entitled to recover the costs incurred in that action. *Id.* at 7. Shortly after that, the Board of Commissioners retained a law firm to investigate the actions of Huff and Johnson

and make a recommendation regarding their employment.  According to Huff, the firm's lawyers knew before the investigation that several commissioners wanted to fire Huff and Johnson.

The law firm reviewed documents and interviewed Johnson, Huff, Little, Bradford, Chapman, and several other individuals. The law firm presented a report to the Board of Commissioners.  In that report, the law firm referenced the 2017 demand letter, the 2017 lawsuit, and Huff's 2018 emails to POST.  The report noted that the Employee Handbook prohibited "Conduct reflecting discredit on the County or department."  Defs.' Mot. for Summ. J. Ex. T, Letter to Walton Cnty. Bd. Of Comm'rs 6 (May 7, 2019), ECF No. 44-20.  The report concluded that the demand letter, the defamation action, and the two POST emails violated Walton County policies and stated that "disciplinary action up to and including termination is warranted under these circumstances," although it pointed out several mitigating factors pertaining to the lawsuit. *Id*. at 7.  First, the report stated that Little encouraged the lawsuit.  Second, the report stated that Bradford had a tendency to "focus on minutiae, and to apply an unreasonably exacting standard" and had a "problematic" inclination "to 'stir up' issues relating to the [Parks and Recreation] Department."  *Id.*  Third, the report noted that the lawsuit was dismissed primarily on legal grounds, not on the merits.  The report suggested that these mitigating factors regarding the lawsuit be considered.  *Id.*

The Board of Commissioners considered the report.  The commissioners voted to suspend Johnson and terminate Huff.  Adams Decl. ¶ 18; Banks Decl. ¶ 20; Bradford Decl. ¶ 20; Dixon Decl. ¶ 17; Shelnutt Decl. ¶ 17.  The commissioners' articulated reasons for the disparate treatment were that there was no evidence that Johnson was involved in the POST emails and that the Board concluded Huff "was more of the driving force behind the demand to the County and the 2017 lawsuit."  Adams Decl. ¶ 18; Banks Decl. ¶ 20; Bradford Decl. ¶ 20; Dixon Decl. ¶ 17; Shelnutt Decl. ¶ 17. While Huff contends that the POST emails were a substantial motivating factor in his termination, he also believes that he "was fired based on politics."  Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 56, ECF No. 61-13.[4]

Walton County's human resources director sent Huff a Letter of Proposed Adverse Action for Dismissal.  Defs.' Mot. for Summ. J. Ex. R, Letter from K. Fraser to B. Huff (May 17, 2019), ECF No. 44-18.  The letter stated that Huff was being dismissed "due to numerous violations" of the Walton County Civil Service Personnel Rules & Regulations.  *Id.* at 1.  The letter listed four reasons for Huff's termination: (1) abuse and misuse of equipment and inefficiency in performing his assigned duties based on the POST

---

[4] To the extent that Huff is now trying to pursue a political affiliation First Amendment claim, he did not assert such a claim in his amended complaint, and he may not add one via his summary judgment response briefing.

emails Huff sent from his county computer using his county email;
(2) misconduct based on the content of the POST emails, which
centered on "second and third-hand accounts, rumor, and innuendo,
with reckless disregard for the truth or falsity of the content";
(3) conduct "reflecting discredit" on the county and
insubordination based on the 2017 "demand letter seeking to extract
$500,000 from the County"; and (4) conduct "reflecting discredit"
on the county based on the 2017 lawsuit. *Id.* The letter stated
that the effective date of Huff's termination was June 1, 2019,
and it notified Huff that if he wished to appeal, he should respond
to "the designated Appointing Authority, Derry Boyd – Walton County
Tax Commissioner." *Id.*

Huff requested an appeal and received a hearing with Boyd.[5]
Although Huff had received the adverse action notice, he claims
that he had to present his case to Boyd "against what were
basically unknown problems." Huff Decl. ¶ 80. Huff represents
that he asked to present witnesses but was not permitted to do so,
although he did not clearly identify which witnesses he would have
called had he been permitted to do so. *Id.* In a letter dated
June 4, 2019, Boyd informed Huff that he had conducted a "careful
review of the information [Huff] provided" during their meeting
and had "reached the decision to uphold [Huff's] termination of

---

[5] Boyd scheduled the hearing for May 23. Huff requested a later hearing
date, so the hearing was rescheduled for May 30.

employment." Defs.' Mot. for Summ. J. Ex. V, Letter from D. Boyd to B. Huff (June 4, 2019), ECF No. 44-22.

Huff appealed to the Walton County Personnel Advisory Board. The Personnel Advisory Board held a hearing during which Huff was represented by counsel and permitted to introduce evidence. Several witnesses testified on behalf of Walton County, Little testified on behalf of Huff, and Huff did not testify. The Personnel Advisory Board unanimously upheld Huff's dismissal. Defs.' Mot. for Summ. J. Ex. W, Pers. Advisory Bd. Order & Rec. (Oct. 14, 2019), ECF No. 44-23. That decision was automatically appealed to the Personnel Appeals Board, which reviewed the record and Huff's objections to the Advisory Board's Order and Recommendation. The Personnel Appeals Board unanimously upheld Huff's dismissal. Defs.' Mot. for Summ. J. Ex. X, Pers. Appeals Bd. Final Order (Oct. 28, 2019), ECF No. 44-24.

DISCUSSION

**I.  Huff's First Amendment Retaliation Claim**

Huff's first claim is that Walton County fired him in retaliation for exercising his First Amendment rights based on four separate exercises of speech: (1) the demand letter, (2) the defamation action, (3) the first POST email, and (4) the second POST email. It is "well-settled that a public employee may not be discharged or punished in retaliation for exercising [his] right to free speech under the First Amendment," but it is "also well-

settled that a public employee's free-speech rights are not
absolute." *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1050
(11th Cir. 2022). The Supreme Court established a two-step inquiry
for determining whether a public employee's speech is
constitutionally protected. *Alves v. Bd. of Regents of the Univ.
Sys. of Ga.*, 804 F.3d 1149, 1159 (11th Cir. 2015). The first step
"requires determining whether the employee spoke as a citizen on
a matter of public concern." *Id.* (quoting *Garcetti v. Ceballos*,
547 U.S. 410, 418 (2006)). "If the answer is no, the employee has
no First Amendment cause of action based on [his] employer's
reaction to the speech." *Garcetti*, 547 U.S. at 418. But if the
answer is yes, the employee has a First Amendment claim unless the
government employer "had an adequate justification for treating
the employee differently from any other member of the general
public" based on the government's interests as an employer. *Id.*

A.  Did Huff Speak on a Matter of Public Concern?

Here, there is no dispute that when Huff sent the demand
letter, filed the defamation action, and sent the POST emails, he
spoke as a citizen, not as part of his official job duties. To
determine whether his speech addressed a matter of public concern,
the Court must examine the "'content, form, and context' of the
employee's statement." *O'Laughlin*, 30 F.4th at 1050 (quoting
*Connick v. Myers*, 461 U.S. 138, 147 (1983)). Content is the most
important factor, but the courts "also consider the employee's

attempt to make [his] concerns public along with the employee's motivation in speaking." *Alves*, 804 F.3d at 1162.

"To fall within the realm of 'public concern,' an employee's speech must relate to 'any matter of political, social, or other concern to the community.'" *Id.* (quoting *Connick*, 461 U.S. at 146). The courts "have recognized that 'an employee's speech will rarely be entirely private or entirely public.'" *Id.* (quoting *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1304 (11th Cir. 2005)). "If the 'main thrust' of the speech is on a matter of public concern, the speech is protected[,]" but if the main thrust is matters of only personal interest, it is probably not. *Id.* (quoting *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993) (per curiam)). For example, where the purpose of a private memorandum was to raise personal grievances about a supervisor's management style and poor leadership, it did not relate to a matter of public concern. *Id.* at 1167-68. But where the speech is intended to expose to the public (or other employees) facts that the employee perceives to suggest government corruption, such speech is on a matter of public concern. *O'Laughlin*, 30 F.4th at 1051-52; *see also Connick*, 461 U.S. at 149 (finding that one question on the employee's internal survey touched on a matter of public concern: whether public employees were pressured to work on political campaigns).

Huff argues that the demand letter addressed issues of public concern because it touched on potential harm to the local economy

and vaguely referenced a smear campaign that involved a county commissioner.  The demand letter is clearly a personal grievance.[6] It seeks financial compensation for the county's decision to stop allowing county employees to run private tournaments at county facilities for profit.  To be clear, the county did not ban tournaments.  Nor did it ban Huff and Johnson from running tournaments at county facilities.  The county simply prohibited county employees from personally profiting from hosting tournaments at county facilities.  The main thrust of the letter—two county employees complaining that they are no longer permitted to profit from their use of county facilities—is a matter of personal interest, not of public concern.  The demand letter is not protected by the First Amendment.

The defamation action, on the other hand, does relate to a matter of public concern.[7]  Defendants argue that the defamation action expressed personal dissatisfaction over criticism Huff and Johnson received, but that is not accurate.  The amended complaint

---

[6] Huff argues that the Walton County Superior Court has already determined that his speech in the demand letter relates to a matter of public concern.  It did not.  Rather, the Superior Court concluded that the alleged speech by *Bradford and Robertson about Huff and Johnson* was speech on a matter of public concern.  Super. Ct. Order at 2.  The Superior Court clearly did not decide that *Huff's speech in the demand letter* was on a matter of public concern.

[7] Huff characterizes his First Amendment claim based on the defamation action as being under both the Speech Clause and the Petition Clause of the First Amendment.  The same "public concern" framework applies in either context. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011) (requiring application of public concern test to an action under the Petition Clause).

alleges that an individual commissioner, a county employee, and several others conspired with each other to fabricate evidence and make false statements about Huff and Johnson as part of a smear campaign to get the county to forbid Huff and Johnson from arranging tournaments. In particular, it alleges that the commissioner used his authority to pressure Johnson to hire his friend as a crew leader in the Department of Parks and Recreation, that the new hire spent many of his working hours manufacturing evidence against Huff and Johnson, that the other defendants knew the evidence was manufactured, and that the commissioner and others used the manufactured evidence to spread false statements about Huff and Johnson. Defendants did not clearly argue (and they did not establish) that these allegations were knowingly false or made with reckless disregard for the truth.

Although one purpose of the defamation action was to seek damages from the defendants in the context of Huff and Johnson complaining that they lost an income source, the defamation action plainly has another purpose: to highlight alleged corruption in the county's hiring process and draw attention to the alleged misconduct of a commissioner and county employee in furtherance of the commissioner's political agenda. Thus, the content of the defamation action relates to a matter of political and public concern to the community. Finally, the form was not private because it was a civil action filed in superior court. For these

reasons, the defamation action is speech on a matter of public concern.[8]

Turning to the POST emails, the first one relates to a matter of public concern. Though the first POST email does reflect Huff's personal animus toward Chapman, it also asserts that Chapman was part of the conspiracy with Bradford and others to ruin Huff's personal and professional reputation. Specifically, the first POST email accuses Chapman of obtaining a search warrant for his work computer without probable cause. Regardless of whether a warrant was required for the search of the county computers, Chapman thought one was needed, and he obtained one. The warrant affidavits, though, arguably did not establish probable cause for the search. There was no indication that the officer who signed the affidavit had any independent knowledge of any facts to support probable cause. Instead, the affidavits stated that "[a]llegations ha[d] surfaced" regarding suspected wrongdoing by

---

[8] In support of their argument that the defamation action did not touch on a matter of public concern, Defendants cite *Williams v. Gwinnett County Public Schools* and *Kurtz v. Vickery*. But the speech here is not comparable to the speech in *Williams*, which concerned an essay expressing disdain for therapy dogs in the employee's workplace and a personal grievance against a coworker. 425 F. App'x 787, 790 (11th Cir. 2011) (per curiam). *Kurtz* does not support Defendants' argument because the Eleventh Circuit concluded that the district court *erred* in finding that elements of the plaintiff's speech were *not* fairly characterized as relating to a matter of public concern. 855 F.2d 723, 730 (11th Cir. 1988). While some of the plaintiff's speech in *Kurtz* was on "internal management," some of it related to the potential "financial failure of a state university," which "certainly would be a matter of public concern." *Id.*

Huff and Johnson.  Search Warrant Affs.  The affidavits did not disclose the source of the allegations or mention an informant, and there are no *facts* to suggest a fair probability that evidence of a crime would be found on the computers.

To summarize, the first POST email asserts that the county sheriff ignored the Fourth Amendment's probable cause requirement for the search warrant at issue here.  Then, it reports that the magistrate who signed the warrant sometimes failed to conduct the required independent probable cause analysis before signing search warrants.[9]  These are serious matters that would be of concern to the community.  Although Huff did not attempt to make the contents of the email public, he asked a public agency to consider his allegations as part of an ongoing investigation of Chapman.  The Court is not convinced that the form or the context removes this speech from the category of public concern.  Thus, the first POST email is speech on a matter of public concern.

The second POST email, however, is not protected.  It raised two "examples" of Chapman's alleged abusive political tactics. The first was a summary reference to drug planting tactics alleged in the *Jones* action.  The second POST email contained no specifics about that case—it simply accused the sheriff of planting drugs with no factual support.  The *Jones* action, which was filed more

---

[9] Again, Defendants did not clearly object to the evidence regarding the magistrate's alleged admission.

than a year before Huff sent the second POST email, sought damages against four sheriff's office employees in their individual capacities based on Ms. Jones's assertion that one of them instructed a confidential informant to plant drugs in her car. Chapman was not a defendant in that action, was not alleged to have planted any drugs, and was not alleged to have supervisory liability for any of Ms. Jones's claims. Huff did not clearly point to evidence that he had a factual basis for alleging that Chapman engaged in drug planting tactics.[10]  Accordingly, Huff's statement about drug planting was false and made with at least reckless disregard for the truth.  While honest but inaccurate speech "may further the fruitful exercise of the right of free speech," the First Amendment does not protect "the knowingly false statement" or "the false statement made with reckless disregard of the truth." *Garrison v. State of La.*, 379 U.S. 64, 75 (1964). Based on the present record, the statement about drug planting is not protected.

The second POST email's other focus was an alleged dirt stealing incident.  Huff stated that he heard a third-hand report that Chapman might have ignored the theft of dirt from county property, along with some speculation that the sheriff was trying

---

[10] Huff points out that after the Court issued a summary judgment order denying summary judgment only as to the deputy who allegedly planted the drugs, the *Jones* action settled.  But the summary judgment order was not entered until after Huff sent the second POST email, and the settlement did not happen until a few months after that.

to intimidate a commissioner to vote in his favor.  But Huff also reported that the original source said that the person who took the dirt had permission to take it, so there was no actual theft. Huff did not clearly point to any evidence that he had first-hand knowledge of any of these events or that he independently investigated to determine whether a theft occurred before he sent the second POST email.  He also did not clearly point to any evidence to corroborate his second-hand source's speculation regarding possible attempted intimidation of a commissioner. Accordingly, the current record establishes that Huff's statements about the alleged dirt stealing incident were false and/or made with at least reckless disregard for the truth.  Again, the First Amendment does not protect "the knowingly false statement" or "the false statement made with reckless disregard of the truth." *Garrison*, 379 U.S. at 75.  The second POST email is not protected.

> B.  Did Walton County's Interests Outweigh Huff's First Amendment Interests?

Having concluded that the defamation action and the first POST email were citizen speech that touched on matters of public concern, the Court must weigh Huff's First Amendment interests against Walton County's interest in regulating his speech.  *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015). This issue, like the "public concern" inquiry, is a question of law for the Court.  *Id.*  Pertinent considerations include "whether

the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

"State interests weigh heavily where an employee's speech thwarts the mission of the agency[,]impedes the performance of the speaker's duties[, or] has a detrimental impact on close working relationships." *Morales v. Stierheim*, 848 F.2d 1145, 1149 (11th Cir. 1988). State interests do not weigh heavily, though, if the remark does not cause disruption. *Rankin*, 483 U.S. at 389; *accord Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1320 (11th Cir. 2005) (finding that bus driver who recruited coworkers to join a union-like organization did not impair efficiency because there was no evidence that she did so while performing her job duties). As discussed below, the Court is not persuaded that Walton County's interest in firing Huff outweighed his rights under the First Amendment.

Regarding the defamation action, the Court recognizes that when a petition to the government for a redress of grievances "takes the form of a lawsuit against [a] *government employer*, it may be particularly disruptive." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 390 (2011) (emphasis added). That is why the "public

concern" test applies to claims under the First Amendment's Petition Clause, just as it applies to claims under the Speech Clause. *Id.* at 398. After all, the government "has a significant interest in disciplining employees who abuse the judicial process." *Id.* at 390.[11] Here, though, the defamation action was not against Walton County. It was against several individual defendants, including a sitting commissioner and an employee. And, as discussed above, it touched on a matter of public concern because it alleged that the commissioner and employee engaged in misconduct to further the commissioner's political agenda.

The Superior Court did not find that the action was abusive or frivolous; it concluded that Huff, a manager within a county parks and recreation department, was a public figure for purposes of a defamation claim and that his defamation claim was likely to fail because he had not alleged facts to demonstrate actual malice. Defendants point out that Walton County volunteered to cover the costs for Bradford and Robertson, but the Superior Court ordered Huff and Johnson to pay those costs, so that fact does not change the analysis. Finally, Defendants contend that the action created conflict between the Parks and Recreation Department and the board of commissioners. Defendants did not point to evidence of any

---

[11] In *Guarnieri*, the Supreme Court vacated the lower court's ruling that the public concern test did not apply to Petition Clause claims, and it remanded the action for consideration under the proper framework. 564 U.S. at 399.

instances where conflicts caused by the defamation action negatively impacted the operations of the Parks and Recreation Department or Walton County in general. Thus, Huff's interest in pursuing the defamation action outweighed the county's interest in disciplining him for it, and the defamation action is protected speech.

Turning to the first POST email, Defendants contend that it is mere mud-slinging that is not entitled to protection. But, as discussed above, the first POST email touched on matters of public concern. Defendants also seem to categorize the first POST email as merely a "vituperative, ad hominem attack" like the speech in *Morris v. Crow* and *Mitchell v. Hillsborough County*. In *Morris*, the employee engaged in "profane chewing out of one of her superiors—in full view of her co-workers," in a manner that was "disrespectful, demeaning, rude, and insulting." 117 F.3d 449, 458 (11th Cir. 1997) (per curiam). In *Mitchell*, the employee verbally attacked a county commissioner during a commission meeting, and his speech was full of "female physiology-invoking, adolescent name-calling." 468 F.3d 1276, 1287 (11th Cir. 2006). In contrast, here, the first POST email was neither profane nor abusive.

Defendants' only other argument regarding the first POST email is that it interfered with the efficient delivery of county services. While the email was sent from a county computer using

county email during working hours, there is no evidence that it interfered with the efficient functioning of the office. Rather, Huff asserts that he was on his lunch break—not on the clock—when he sent the email. The email was sent to a single person at POST, and there is no evidence that the email disturbed or interrupted the work of other county employees (or even the sheriff). The Court understands that an employer need not wait for a disturbance before taking action against an employee who engages in speech that might disrupt operations, as long as there is a "[r]easonable possibility of adverse harm." *Moss*, 782 F.3d at 622. But here, the county waited more than a year before taking any action regarding the first POST email. Huff remained employed during that time, which undermines Defendants' argument that Huff's continued employment would cause disruptions. Thus, Huff's interest in sending the first POST email action outweighed the county's interest in disciplining him for it. The first POST email is protected speech.

C.   Is There a Genuine Fact Dispute on Causation?

Defendants contend that even if some of Huff's speech was protected, Huff cannot show causation because his termination was justified in part by speech that is not protected and other considerations. But that does not mandate summary judgment for Walton County. Rather, it makes this case a mixed motives case because the present record suggests that the commissioners

considered both protected and unprotected speech in deciding to fire Huff. In a mixed motives case, if the employee proves that his protected speech was a substantial motivating factor behind the adverse employment action, then the employer has an opportunity to assert an affirmative defense and demonstrate that it would have made the same decision even in the absence of the protected speech. *E.g.*, *Stanley v. City of Dalton*, 219 F.3d 1280, 1296 n.27 (11th Cir. 2000). Defendants argue in their briefs that either exercise of unprotected speech, standing alone, was a valid justification for Huff's termination, but they did not move for summary judgment on the affirmative defense or point to any evidence that they are entitled to the affirmative defense *as a matter of law*. Furthermore, the present record supports a finding that a genuine factual dispute exists on this issue. Accordingly, Walton County's summary judgment motion on Huff's First Amendment claim is denied.

### D.   Are the Commissioners Entitled to Qualified Immunity?

The individual Defendants, who are the members of the Board of Commissioners that voted to fire Huff, contend that even if there is a genuine fact dispute on Huff's First Amendment claim, they are entitled to qualified immunity. Qualified immunity protects a government official acting within his discretionary authority from suit unless his conduct "violates clearly established federal statutory or constitutional rights of which a

reasonable person would have known." *Gaines v. Wardynski*, 871
F.3d 1203, 1206 (11th Cir. 2017) (quoting *Sanders v. Howze*, 177
F.3d 1245, 1249 (11th Cir. 1999)).  For qualified immunity to
apply, existing precedent must have placed the constitutional
question "beyond debate."  *Gaines*, 871 F.3d at 1210 (quoting
*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

In a First Amendment retaliation case, a defendant is entitled
to qualified immunity if "the record indisputably establishes that
the defendant in fact was motivated, at least in part, by lawful
considerations."  *Stanley*, 219 F.3d at 1296 (emphasis omitted).
So, if "the facts assumed for summary judgment purposes in a case
involving qualified immunity show mixed motives (lawful *and*
unlawful motivations) and pre-existing law does not dictate that
the merits of the case must be decided in plaintiff's favor, the
defendant is entitled to immunity."  *Foy v. Holston*, 94 F.3d 1528,
1535 (11th Cir. 1996).  Here, the present record suggests that the
individual Defendants voted to terminate Huff based on four
separate exercises of speech, two that were protected under the
First Amendment and two that were not.  For these reasons, the
Court cannot conclude that a reasonable commissioner would have
known that terminating an employee in this particular factual
context violated the First Amendment.  Accordingly, the Court finds
that the individual Defendants (Bo Warren, Mark Banks, Timmy
Shelnutt, Lee Bradford, Jeremy Adams, and Kirklyn Dixon) are

entitled to summary judgment based on qualified immunity on Huff's First Amendment claim.

## II. Huff's Due Process Claim

In addition to his First Amendment claim, Huff asserts that Defendants deprived him of a protected interest in continued employment without due process, in violation of the Fourteenth Amendment. Defendants assume for purposes of summary judgment that Huff had a protected property interest in continued employment. They contend, though, that he cannot establish a procedural due process claim because he did not present evidence that he did not receive all the process that was due.

The essential elements of due process "are notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). Before a public employee with a property interest in his job can be fired, the "employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* "'While some pre-termination hearing is necessary' in the public employment context, 'it need not be elaborate.'" *Hakki v. Sec'y, Dep't of Veterans Affs.*, 7 F.4th 1012, 1032 (11th Cir. 2021) (quoting *Laskar v. Peterson*, 771 F.3d 1291, 1297 (11th Cir. 2014)). A pre-termination hearing "need not definitely resolve the propriety of the discharge" but instead "should be an initial check against mistaken decisions—

essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Narey v. Dean*, 32 F.3d 1521, 1527 (11th Cir. 1994) (quoting *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994)).

Here, Huff received a list of the charges against him before the pre-termination hearing. Huff had an opportunity to tell Boyd his side of the story during the hearing, before Boyd issued his decision officially terminating Huff. Huff therefore received the process he was due under *Loudermill*. Huff also received significant post-termination process, including a full hearing before the Walton County Personnel Advisory Board, where he was represented by counsel and able to call witnesses. And, he was able to raise objections to the Advisory Board's order by appealing to the Personnel Appeals Board. For these reasons, the Court finds that Huff failed to create a genuine fact dispute on his procedural due process claim, and Defendants are entitled to summary judgment on that claim.

### III. Huff's Breach of Contract Claim

In addition to his federal law claims, Huff asserts a state law breach of contract claim against Walton County only. Huff argues that Walton County violated procedures in its Civil Service Personnel Rules and Regulations, but he did not present evidence or authority that the termination provisions in the Rules

constitute an employment contract.  While a policy that public employees can be terminated only for cause may "give the employee an interest in continued employment for purposes of procedural due process analysis . . . that does not mean that a manual stating the policy and setting forth procedures for its implementation is a contract.'" *Jones v. Chatham Cnty.*, 477 S.E.2d 889, 893 (Ga. Ct. App. 1996).  Under Georgia law, "personnel manuals stating that employees can be terminated only for cause and setting forth termination procedures are not contracts of employment; failure to follow the termination procedures contained in them is not actionable." *Id.*[12]  So, if "a public employee has a personnel manual stating [he] can be fired only for cause, [he] is entitled to procedural due process, the adequacy of which is governed by federal law." *Id.*  "But if the requirements of due process are met, the employer's failure to follow all the procedures in the manual does not give rise to an action for breach of contract." *Id.*  Because Huff did not point to evidence or authority that his

---

[12] Huff did not point to any authority that the personnel policies here, set forth in county personnel rules, should be treated differently than policies contained in a personnel manual.  The policies here are substantially similar to those that are contained in personnel manuals, and the Court thus considers them as such.  *See O'Connor v. Fulton Cnty.*, 805 S.E.2d 56, 58 & n.1 (Ga. 2017) (finding that a policy in a county personnel regulation did not create an employment contract).  The Georgia courts recognize that that the provisions of an employee manual regarding *benefits* could be a legally binding contract, but they have not extended this rationale to policies on termination of employment.  *Jones*, 477 S.E.2d at 893 n.3; *see also Fulton Cnty. v. Andrews*, 773 S.E.2d 432, 437 (Ga. Ct. App. 2015) (finding that Fulton County regulations regarding *compensation* amounted to a contractual obligation).

termination amounted to a breach of contract, Walton County is entitled to summary judgment on that claim.

## IV.  **Huff's Whistleblower Act Claim**

Finally, Huff makes a claim against Walton County only under the Georgia Whistleblower Act, O.C.G.A. § 45-1-4(d)(2).  That statute prohibits a public employer from retaliating "against a public employee for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency, unless the disclosure was made with knowledge that the disclosure was false or with reckless disregard for its truth or falsity." O.C.G.A. § 45-1-4(d)(2).  To establish a claim under the Whistleblower Act, an employee must establish that "(1) he was employed by a public employer; (2) he made a protected disclosure or objection; (3) he suffered an adverse employment action; and (4) there is some causal relationship between the protected activity and the adverse employment action." *Albers v. Ga. Bd. of Regents of Univ. Sys. of Ga.*, 766 S.E.2d 520, 523 (Ga. Ct. App. 2014). Here, there is no dispute that Huff was a public employee employed by a public employer and that he suffered an adverse employment action when he was terminated.

Walton County argues that Huff never engaged in any protected whistleblowing activity because he did not disclose a violation of a law, rule, or regulation.  Huff contends that both POST emails were protected whistleblower activity.  As discussed above, the

second POST email accused the sheriff of engaging in drug planting tactics, but the present record establishes that statement was false and/or made with reckless disregard for the truth, so it is not protected under the Whistleblower Act.  Huff contends that the second POST email also reported theft of county dirt, but the second POST email itself stated that the original source indicated that the person who took the dirt had permission to do so.  And, as discussed above, Huff did not clearly point to any evidence that he had first-hand knowledge of any of these events or that he independently investigated to determine whether a theft occurred before he sent the second POST email.  His report of the alleged dirt stealing incident was made with at least a reckless disregard for the truth.  It is not protected under the Whistleblower Act.

In contrast, the first POST email is protected.  As discussed above, the first POST email asserts that the county sheriff ignored the Fourth Amendment's probable cause requirement for the search warrant at issue here and that the magistrate sometimes failed to conduct the required independent probable cause analysis before signing search warrants.  The Court is thus satisfied that Huff presented sufficient evidence to show that he engaged in protected whistleblowing activity when he sent the first POST email.  Walton County does not seriously dispute that there is enough evidence for a juror to find a causal connection between the first POST email and Huff's termination.  Walton County is not entitled to

summary judgment on the Whistleblower Act claim that is based on the first POST email.

CONCLUSION

For the reasons set forth above, the Court denies Walton County's summary judgment motion on Huff's First Amendment claim; the Court grants the summary judgment motion of the individual Defendants (Bo Warren, Mark Banks, Timmy Shelnutt, Lee Bradford, Jeremy Adams, and Kirklyn Dixon) on Huff's First Amendment claim; the Court grants summary judgment to all Defendants on Huff's procedural due process claim; the Court grants summary judgment to Walton County on Huff's breach of contract claim; and the Court denies summary judgment to Walton County on Huff's Whistleblower Act claim based on the first POST email but otherwise grants Walton County's summary judgment motion on the Whistleblower Act claim.

The only claims remaining for trial are the claims against Walton County for First Amendment retaliation and violation of the Georgia Whistleblower Act.

IT IS SO ORDERED, this 8th day of September, 2022.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA